1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NextEngine Inc.,<br><br>               Plaintiff,<br><br>v.<br><br>NextEngine, Inc., *et al.*, and Mark S. Knighton,<br><br>               Defendants. | Case No.  2:19-CV-00249-AB (MAA)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**TRIAL DATE: STIPULATED FACTS TRIAL** |

This matter was submitted to this Court, sitting without a jury, on April 9, 2021.

Marc Reich of Reich Radcliffe and Hoover LLP and Peter Moroh of Peter K. Moroh Law Offices represented Plaintiff NextEngine Inc. ("Plaintiff").  Johnny Kim of J. Kim, APLC represented Defendants NextEngine, Inc. and Mark S. Knighton ("Defendants").

Plaintiff has asserted claims for direct, indirect, and contributory patent and trademark infringement, as well as unfair competition.  The dispositive issue is the effect of several agreements on ownership of the subject intellectual property.  The parties waived jury trial, agreed that the material facts were undisputed, and elected to proceed with a bench trial in order for the Court to determine the legal effect of the stipulated facts.  The parties filed Joint Stipulated Facts for Stipulated Jury Trial (Dkt.

No. 80), along with trial briefs (Dkt. Nos. 81–82) and proposed findings of fact and conclusions of law (Dkt. Nos. 86–87). Given the parties' stipulation, the foregoing are the only materials the Court considered in resolving this case.  The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### The Parties and Related Entities and Individuals

1.     Plaintiff is a New York based corporation.  Joint Stipulated Facts ("JSF"), ¶ 1 (Dkt. No. 80).

2.     Defendants are a California based corporation and an individual who is a chief agent of that corporation.  JSF, ¶ 2.  The individual, Defendant Marc S. Knighton ("Knighton"), is the Founder, Chairman, Chief Executive Officer, and largest shareholder of Defendant NextEngine ("Defendant").[1]  JSF, ¶ 3.

3.     Bigfoot Ventures Ltd. ("Bigfoot") is a foreign company formed in the British Virgin Islands and based in Hong Kong, S.A.R.  JSF, ¶ 4.

4.     NextPat Ltd. ("NextPat") is a foreign company formed and also based in Hong Kong.  JSF, ¶ 5.  Upon NextPat's formation, Bigfoot owned 51 of Nextpat's 100 shares and Defendant owned the other 49.  JSF, ¶ 5.

5.     Michael Gleissner is one of the Defendant's largest shareholders and is the owner and operator of Plaintiff, Bigfoot, and NextPat.  JSF, ¶ 6.

### The Intellectual Property-In-Suit

6.     Defendant is involved in research, development, manufacturing, and sale of three-dimensional laser scanners.  JSF, ¶ 7.

7.     In the course of its business, Defendant obtained numerous patent and trademark registrations ("NextEngine IP", or "the IP"), listing Knighton as an

---

[1] Henceforth, Defendant will refer specifically to Defendant NextEngine unless otherwise stated.

2.

inventor, in order to protect the technology, character mark, and logos of Defendant's flag shift product (the "3D Ultra HD" laser scanner, or "the Scanner").  JSF, ¶¶ 7–9.

**The 2008 Secured Loan and its Subsequent Restructuring**

8.     Between 2002 and 2005, Bigfoot made a series of loans to Defendant in secured promissory notes and security agreements, wherein Defendant pledged the IP to Bigfoot as collateral.  JSF, ¶ 10.

9.     On June 2, 2008, Defendant and Bigfoot agreed to restructure the security loan pursuant to six agreements concurrently prepared and executed, which collectively constituted one secured loan and security agreement (collectively, the "2008 Loan Agreements").  This agreement included (i) a 2008 Promissory Note ("2008 Note"), (ii) an Assignment and License Agreement, (iii) a Share Mortgage Agreement, (iv) a Shareholders Agreement, (v) a Mutual Release Agreement, and (vi) the Pledge Agreement.  (*Id.*)

10.     The restructuring did not disturb Bigfoot's first place security interest in the IP, rather, it simply required that the collateral be assigned to and held by a third party custodian or escrow entity (NextPat), which was created by Defendant and Bigfoot solely for that purpose.  JSF, ¶ 12.

**i.     The Promissory Note**

11.     The Promissory Note required Defendant to assign its IP to NextPat via the Assignment and License Agreement.  JSF, ¶ 13(a).

12.     It defines "Collateral" as "all of NextPat's right, title, and interest in and to" all of the IP Rights, and that "[IP] Rights" shall have the meaning set forth in section 1 of the Assignment and License Agreement.  JSF, ¶ 13(b–c).

**ii.     The Assignment and License Agreement**

13.     The Assignment and License Agreement ("A&L Agreement") reflected that "[i]n order [to] facilitate the [Promissory] Note restructuring NextEngine and NextPat each desire that NextPat receive ownership of all of the [IP] Rights currently

3.

held by [Defendant] and that [Defendant] receive an exclusive license back to such [IP] Rights."  JSF, ¶ 14.

14.     Section 1 of the A&L Agreement assigned NextPat "all of [Defendant's] rights, title and interest in and to the [IP] Rights," including the IP.  JSF, ¶ 15.

15.     Section 2(a) of the A&L Agreement granted Defendant an exclusive license (the "License") to freely use the IP Rights "subject to certain revocation rights, including if Defendant defaulted under the Promissory Note."  JSF, ¶ 16.  Section 2(b) provides that, notwithstanding an event of default, the License would remain irrevocable if Defendant paid the monthly interest and quarterly fees.  JSF, ¶ 17.  The irrevocable license would prohibit NextPat from selling the IP or attaching any other encumbrances to it.  (*Id.*)  Section 2(c) provides that if the License becomes revocable, "NextPat may, upon written Notice to [Defendant], terminate the license" granted by the A&L Agreement.  JSF, ¶ 18.

16.     Section 4 of the A&L Agreement limits each party's total liability to the other party, relating to this agreement, to fifty dollars.  JSF, ¶ 19.  This limitation is applicable even if any remedy provided in the agreement is found to have failed its essential purpose.  (*Id.*)

### iii.   The Share Mortgage Agreement

17.     For the Share Mortgage Agreement ("SM Agreement"), Defendant deposited share certificates with Bigfoot, evidencing Defendant's 49 shares in NextPat as security for BigFoot's loan ( "Mortgaged Shares").  JSF, ¶ 20.

18.     The SM agreement provided that, if Defendant defaulted under the 2008 Note, "the security would become enforceable."  JSF, ¶ 21.  However, if Defendant paid the monthly interest and certain quarterly fees, Bigfoot and its affiliates (including NextPat) retained all of the Mortgaged Shares, with NextPat retaining the IP collateral assigned by Defendant.  (*Id.*)  In the absence of default, Bigfoot also agreed to defer any sale, solicitation for sale, or other disposition or encumbrance of the IP.  (*Id.*)

19.    The SM Agreement states that, subject to the conditions above (in ¶ 18) and the rest of the agreement, if a default occurs, "Bigfoot could exercise any rights with respect to the Mortgaged Shares and the [IP] Rights, including without limitation, (i) the transfer to, and retention by, Bigfoot of the Mortgages Shares, (ii) the sale, disposition or licensing of the [IP] Rights, or (iii) the sale of the Mortgaged Shares ([citing SM] Agreement, p. 8, ¶ 10). JSF, ¶ 22.

20.    Paragraph 11 of the SM Agreement states that, "for the avoidance of doubt, in the event of a permitted sale of the NextPat shares of IP, the proceeds must be applied towards the satisfaction or partial satisfaction of the Note without prejudice to [Bigfoot's right] to sue for any deficiency of the Note." JSF, ¶ 23.

21.    Once all obligations have been paid, Bigfoot's security interest would be "discharged and extinguished." JSF, ¶ 24.

**iv.    The Shareholders Agreement**

22.    Under the Shareholders (the "SH") Agreement, as long as Defendant's License remained irrevocable, Bigfoot and its affiliates (including NextPat and its officers or shareholders) were prohibited from allowing NextPat to: "(a) engage in any transactions or activities other than being a holding company for the IP collateral; (b) create or otherwise suffer any liens on the IP collateral, or (c) sell, transfer, or otherwise encumber" any NextPat shares held by Bigfoot or Plaintiff. JSF, ¶ 25(a).

23.    If Defendant's License became revocable, however, Bigfoot could sell or dispose of any part of the IP collateral or NextPat shares in order to satisfy the debt. JSF, ¶ 25(b).

24.    If any of the IP collateral was to be sold by public auction, Bigfoot would be required to notify Defendant and allow Defendant a reasonable opportunity to purchase the IP at a higher bid. JSF, ¶ 25(c).

25.    If any of the NextPat shares or the IP collateral was to be sold by private sale, Bigfoot would be required to notify Defendant and allow it five days from receipt of notice to offer a higher bid. JSF, ¶ 25(d).

26.     If a permitted sale of any NextPat shares or the IP Collateral occurred, the sale proceeds were to be applied toward satisfying the Note.  JSF, ¶ 25 (e).

27.     It also provided that "Bigfoot and/or NextPat may for convenience accept bids pertaining to the sale of any part of the NextPat shares or any part of the Collateral from Michael Gleissner, Bigfoot, or any other entity materially affiliated with or controlled by Gleissner (each, an 'Affiliated Buyer'); *provided however*, that the Affiliated Buyer shall remain subject to all of the covenants herein."  JSF, ¶ 25(f).

28.     The SH Agreement also reads: "[N]otwithstanding any default, if any part of the IP Collateral or NextPat shares is owned or controlled by any entity materially affiliated with or controlled by Michael Gleissner, Defendant [] is entitled to redeem or repurchase such IP or NextPat shares . . . by repaying the amount then owed under the Note including all accrued interest and any due but unpaid quarterly fees; provided however, if only a portion of the NextPat Shares or IP Collateral is repurchased by Defendant [], the price shall be mutually agreed at some pro-rata portion of the amount owed under the Note."  JSF, ¶ 25(g).

**State Court Action I**

29.     In December 2009, after the loan was restructured pursuant to the 2008 Agreement, Bigfoot brought a state court action against Defendant for an alleged breach of the 2008 Note ("State Court Action I").  JSF, ¶ 26.  Defendant prevailed at trial by jury in the Los Angeles Superior Court.  (*Id.*).

30.     The jury verdict  yielded a judgment in Defendant's favor, and against Bigfoot, regarding: (i) "Bigfoot's claim for breach of the Note", which expressly "confirms that the collateral for the Note is the IP rights of Defendant," and (ii) Defendant's cross claims under the UCC Art. IX (Secured Transactions) for Bigfoot's treatment of the IP pledged as collateral by Defendant (to which it awarded Defendant $4.5 million in damages against Bigfoot ("State Judgment I")).  JSF, ¶ 27.

**Bigfoot's Appeal**

31.     Bigfoot unsuccessfully appealed State Judgment I, which was affirmed in its entirety via a written decision issued by the California Court of Appeal.  JSF, ¶ 28.

32.     In affirming the prior judgment, the appellate court expressly stated the following:

a.  "As defined in the 2008 Secured Promissory Note, the collateral for the restructured loan was the intellectual property rights held by NextPat Ltd., a Hong Kong company that was formed by Bigfoot and NextEngine solely for the purpose of holding that collateral."  JSF, ¶ 29(a).

b.  "Under the [A&L] Agreement, NextEngine assigned to NextPat all of its rights, title, and interest in NextEngine's [IP], including its patents, copyrights, trademarks, and trade secrets, and NextPat granted to [Defendant] an exclusive perpetual license to use the [IP] rights. Notwithstanding an event of default under the restructured loan, the license would remain irrevocable for so long as [Defendant] paid in full to Bigfoot (i) each monthly interest payment that was due by the end of each calendar month pursuant to the 2008 Secured Promissory Note and (ii) each quarterly fee payment that was due pursuant to the Mutual Release Agreement. For so long as the license remained irrevocable, NextPat agreed to retain all of the intellectual property rights assigned by [Defendant], and to defer any sale, solicitation for sale, or other disposition or encumbrance of the [IP] rights. In the event the license became revocable, NextPat could terminate the license upon written notice to NextEngine."  JSF, ¶ 29(b).

c.  "Under the [SM] Agreement, NextPat had 100 shares of authorized capital of which 51 shares were issued to Bigfoot and 49 shares were issued to Next Engine . . . Upon the occurrence of an event of default under the loan, [Defendant]'s 49 shares in NextPat automatically would transfer to Bigfoot . . . If all payments due under the restructured loan

7.

were fully paid by [Defendant] NextEngine, Bigfoot would transfer 49 mortgaged shares in NextPat back to NextEngine. However, if an event of default continued to occur and NextEngine failed to make any monthly interest payment or any quarterly fee payment when due, Bigfoot could thereafter solicit for sale and sell any part of the NextPat shares or any part of the intellectual property rights." JSF, ¶ 29(c).

    d. "Under the [SH]  Agreement, if Bigfoot intended to sell any part of the IP collateral through a public auction, Bigfoot was required to notify [Defendant] NextEngine of such auction and allow NextEngine a reasonable opportunity to purchase the IP at a higher bid. If Bigfoot intended to sell any part of the NextPat shares or the IP collateral through a private sale, Bigfoot was required to notify NextEngine of such pending sale and allow NextEngine five business days after receipt of the notice to offer a higher bid. In the event of a permitted sale of any of the NextPat shares or the [IP] rights, the proceeds from the sale would be applied towards the satisfaction of the 2008 Secured Promissory Note. " JSF, ¶ 28(d).

33.    The appellate court also expressly stated, "Bigfoot is not precluded from seeking to enforce its right to recover the payments owed by [Defendant] NextEngine under the 2008 Loan Agreement, provided however, that any future enforcement action taken by Bigfoot must comply with the terms of the parties' agreement and the relevant provisions of the UCC." JSF, ¶ 30.

**Defendant Next Engine's Default and Bigfoot's Resulting Judgment**

34.    On January 16, 2015, Bigfoot (holder of the Promissory Note) provided written notice of its demand for payment to Defendant; Defendant subsequently defaulted.  JSF, ¶ 31.

35.     On February 20, 2015, in response to Defendant's default, Bigfoot filed a Complaint for the money due under the Note against Defendant in the Los Angeles County division of the California Superior Court.  JSF, ¶ 32.

36.     On October 21, 2016, Bigfoot won on summary judgment and, on March 16, 2017, received a final judgment of $8,223,486 ("Bigfoot's Judgment").  JSF, ¶ 33.

37.     Pursuant to Defendant's default (and the terms of the Note and SM Agreement), Defendant's Mortgaged Shares in NextPat were transferred to Bigfoot, making Bigfoot the sole owner of NextPat's 100 shares.  JSF, ¶ 34.

38.     Following entry of BigFoot's Judgment, Bigfoot became entitled to sell the IP in a commercially reasonable manner to satisfy Bigfoot's Judgment.  JSF, ¶ 35.

**NextPat's Termination of Defendant NextEngine's License**

39.     On January 20, 2017, NextPat gave Defendant written notice that it was terminating the License under Section 2(c) of the A&L Agreement because of Defendant's default on the 2008 Note and failure to pay monthly interest and Quarterly Fee Payments.  JSF, ¶ 36.  Additionally, NextPat demanded that Defendant immediately cease using any of the IP Rights ("IP Rights"), including use of the IP at issue in this suit.  (*Id.*)

40.     On March 31, 2017, NextPat mailed a second letter to Defendants again demanding that Defendant NextEngine cease its continued use of the IP Rights and properties, pursuant to NextPat's License termination notice.  JSF, ¶ 37.

41.     Despite NextPat's termination of Defendant's License, and NexPat's repeated demands, Defendant did not discontinue using the IP Rights or stop selling the Scanner and supporting goods, be it temporarily or otherwise.  JSF, ¶ 38.

42.     Accordingly, between January 20, 2017 and June 8, 2020, Defendant derived aggregate revenues of approximately $2,450,000 from continued sale of the Scanner and/or other goods utilizing the IP at Issue.  JSF, ¶ 39.  Despite these revenues, Defendant has yet to pay Bigfoot anything towards satisfaction of Bigfoot's Judgment, which currently totals approximately $11.4 million including interest.  (*Id.*)

**Plaintiff is Incorporated in New York**

43.     On or about March 31, 2017, after entry of Bigfoot's money judgment, Plaintiff was incorporated in the state of New York.  JSF, ¶ 40.

**NextPat's Assignment of Registered Patents and Marks to Plaintiff**

44.     On December 6, 2017, NextPat and Plaintiff entered into a Trademark Assignment Agreement (the "TM Assignment") wherein NextPat assigned to Plaintiff "all right, title, and interest" in the Trademarks, including "all income, royalties, and damages hereafter due and payable to [NextPat] with respect to the [Registered] Trademarks, including without limitation, damages, and payments for past, present and/or future infringements and misappropriations of the [Registered] Trademarks," along with "all rights to commence legal proceedings for past, present and/or future infringements or misappropriations of the [Registered] Trademarks."  JSF, ¶ 41.

45.     In consideration of NextPat's assignment to Plaintiff, Plaintiff agreed to pay a total of ten dollars ($10.00).  JSF, ¶ 42.

46.     Gliessner signed the TM Assignment both as NextPat's President ("Assignor") and as Plaintiff's President ("Assignee").  JSF, ¶ 43.

47.     Neither entity provided Defendant notice that NextPat's assigned the Trademarks to Plaintiff.  JSF, ¶ 44.  NextPat did not apply the sale proceeds toward satisfying the Note or conduct a valuation of the Trademarks.  (*Id.*)  NextPat did not credit any value of the assigned Trademarks toward satisfying the Note either.  (*Id.*)

48.     On December 11, 2017, NextPat and Plaintiff entered into a Patent Assignment Agreement (the "Patent Assignment") wherein NextPat assigned to Plaintiff all right, title, and interest in and to the Registered Patents, including "all income, royalties, and damages hereafter due and payable to [NextPat] with respect to the [Registered] Patents, including without limitation, damages, and payments for past, present and/or future infringements and misappropriations of the [Registered] Patents," along with "all rights to commence legal proceedings for past, present and/or future infringements or misappropriations of the [Registered] Patents."  JSF, ¶ 45.

10.

49.     In consideration of NextPat's assignment of the Patents, Plaintiff agreed to pay ten dollars ($10.00).  JSF, ¶ 46.

50.     Gliessner signed the Patent Assignment as President for both NextPat (as "Assignor") and Plaintiff (as "Assignee").  JSF, ¶ 47.

51.     NextPat did not provide Defendant with any notice of the assignment, or apply its proceeds towards satisfying the Note, or conduct valuation of the Patents, or credit its valuation toward satisfying the Note.  JSF, ¶48.

**Plaintiff Initiates the Instant Action**

52.     On or about December 14, 2017, three days after NextPat and Plaintiff consummated the 2017 Patent and TM Assignments, Plaintiff initiated the instant action against Defendants in the Southern District of New York, proposing that, as a result of the purported Trademark and Patent Assignments, Plaintiff had become the beneficial owner of all rights, title, and interest in and to the IP.  JSF, ¶ 49.

**Plaintiff's Renewal of the Registered Trademarks**

*53*.     On or about October 19, 2018, Plaintiff had its attorney, Roman A. Popov, record a "Combined Declaration of Use/Application for Renewal of a Mark and Specimen of Use in Commerce" with the USPTO to renew the registrations of the marks-in-suit.  JSF, ¶ 50.  Popov was Plaintiff's counsel of record at the beginning of this suit, before being substituted out by current counsel.  (*Id.*)  Defendant's website was the only specimen provided with the declaration to establish Plaintiff's use of the Trademarks in commerce in order to satisfy the §§8-9 Trademark Act renewal requirement.  (*Id.*)

**Plaintiff's Assignment of the Registered Patents Back to NextPat**

*54*.     While the instant action was pending, on or about February 27, 2020, Plaintiff assigned "all of its purported rights, title, and interest in and to all of the Patents ***back*** to NextPat pursuant to another 'Patent Assignment Agreement' by and between [P]laintiff as 'Assignor', and NextPat, as 'Assignee' (hereinafter the "2020

Patent Assignment []').”  JSF, ¶ 51.  In consideration of NextPat's assignment of the Patents, Plaintiff agreed to pay a total of ten dollars.  (*Id.*) (emphasis in original).

55.    Gleissner signed the agreement as the President of both NextPat (as "Assignor") and Plaintiff (as "Assignee").  JSF, ¶ 52.

**Amendment of Bigfoot's Judgment to Add Defendant Knighton**

56.    On July 8, 2020, on Bigfoot's motion, and following NextEngine's unsuccessful appeal of Bigfoot's Judgment, the court amended Bigfoot's Judgment to add Defendant Knighton, individually, as a judgment debtor based on the court's finding that Knighton is the alter ego of Defendant NextEngine.  JSF, ¶ 53.

57.    The court also amended Bigfoot's Judgment to add ShapeTools LLC as a judgment debtor based on the court's finding that ShapeTools existed only to shield Defendant from its debt to Bigfoot.  JSF, ¶ 54.

# CONCLUSIONS OF LAW

## I.    JURISDICTION

The parties have asserted that the Court has Federal Question jurisdiction over this matter pursuant to 35 U.S.C. § 271(a) and (b), which provides that a patent owner may seek an infringement action against anyone who uses, offers to sell, or sells any patented invention (an "infringer") within the United States.  Due to the nature of the claims in this case, however, it is debatable whether a Federal Question exists. Nonetheless, the Court will not further address this point because it obviously has Diversity Jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1).

Whether Plaintiff has standing is also in issue, but because standing is entwined with the merits of the case, the Court addresses this issue below.

## II.   DISCUSSION

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  Anyone who "makes, uses, offers to sell, or sells any patented

1  invention" without authority to do so within the United States "during the term of the
2  patent therefor, infringes the patent." 35 U.S.C. § 271(a). Anyone who "actively
3  induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

4      "To prevail on [a] trademark infringement claim, [a Plaintiff] must show that:
5  (1) it has a valid, protectable trademark, and (2) that [the Defendant's] use of the mark
6  is likely to cause confusion." *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d
7  966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
8  174 F.3d 1036, 1047, 1053 (9th Cir. 1999)). "The standard for Lanham Act unfair
9  competition is the same as for Lanham trademark infringement." *Novalogic, Inc. v.*
10 *Activision Blizzard*, 41 F.Supp.3d. 885, 904 (C.D. Cal. 2013) (quoting *Glow*
11 *Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 975 n. 90 (C.D. Cal. 2002)) (citing
12 *Brookfield*, 174 F.3d at 1045).

13     The crux of this case rests on the answer to two questions: (1) whether the 2008
14 Loan Agreements transferred ownership of the IP[2] from Defendant to NextPat and, (2)
15 if so, whether NextPat's assignment of the IP to Plaintiff successfully transferred
16 ownership of that IP to Plaintiff.[3] If either of these assignments have not essentially

17

18 [2] Henceforth, Plaintiff's Patent, Trademark, and Unfair Competition claims will
   collectively be referred to as "the IP Claims" because the three claims are not
19 particularly helpful towards resolving the contentions raised by Plaintiff and
   Defendant. This dispute critically depends on whether the 2008 Loan Agreements
20 truly dictate what Plaintiff purports to be so. Since the case was filed as a patent
   infringement suit, the Court will heavily cite patent law, but it should be noted that the
21 underlying (and governing) law here is based in state contract law. *See* Court's Order
   Denying Defendant's Motion to Dismiss ("MTD Denial"), Dkt. No. 78, at 2 ("[T]his
22 case really sounds in contract and not in patent or trademark, as Defendant admits
   using the [IP] in issue . . . and the dispute is simply over ownership of that property.");
23 *see also* Order Remanding Action, *NextPat, Ltd. v. NextEngine, Inc.*, CV 17-04329
   (Dkt. No. 32) (declining removal of similar claims involving the parties, for
24 declaratory and injunctive relief, because they were mainly contract based rather than
   based in patent or trademark law). Thus, for the sake of judicial economy, the Court
25 will avoid heavy reference to the respective trademark and unfair competition laws.
26

27 [3] Plaintiff argues that "the only real question for the Court is to determine the
   appropriate remedy for [these claims], and whether it should include both economic
28 damages and injunctive relief," but Defendant's Trial Brief strongly disagrees.

1    occurred, then Plaintiff cannot assert standing to support its cause of action. For the

2    reasons stated below, Plaintiff's claims **FAIL** to establish standing.

3    ### A. <u>Standing to Assert Patent Infringement</u>

4         Plaintiff asserts that, because of the December 2017 assignments of the IP

5    Rights from NextPat to Defendant, it was "therefore a patentee and owner" of the IP

6    and had "statutory and constitutional standing to sue." Plaintiff's Memo, at 3 (citing

7    MTD Denial).[4] Defendant contends that, based on the stipulated facts, "Plaintiff did

8    not receive any substantive rights or interest in the IP and thus has no right or standing

9    to pursue any of its infringement claims against Defendants." Defendants' Brief, at 3,

10   14, 24. The Court addresses this issue below.

11        "The federal courts are under an independent obligation to examine their own

12   jurisdiction, and standing is perhaps the most important of the jurisdictional

13   doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995) (citations and quotations

14   omitted). "Whether a party has constitutional standing to 'assert the jurisdiction of a

15   federal court is a question of federal law, and standing is to be determined as of the

16   _____

17   Plaintiff's Memo of Points and Authorities ("Plaintiff's Memo"), Dkt. 81, at 2;
     Defendants' Trial Brief ("Defendants' Brief"), Dkt. 82. Defendant contends that it
18   originally held the IP and only assigned it to NextPat "to be held as collateral",
     thereby retaining "Defendant's redemption rights [and] rights to all residual equity or
19   value in the IP it pledged as collateral." Defendants' Brief, 2–3. Thus, the Court must
     address the dispute as to ownership and transfer before deciding whether Plaintiff's
20   pursued remedy is warranted under the circumstances.

21

22   [4]Earlier in this suit, the Court denied Defendants' challenge of Plaintiff's statutory and
     constitutional standing to maintain the patent claims. *See* MTD Denial. In short, the
23   Court held that Plaintiff did not convey its right to sue for infringement simply
     because it transferred the IP Rights back to NextPat after initiating this suit and that
24   Plaintiff's prior status as "a patentee" remained thereafter. *Id.* at 7–9. The standard
     for that motion, a motion to dismiss, however, is much lower than that required to
25   prove infringement, here, in a stipulated facts trial. *See Rivera v. Remington Designs,
     LLC*, No. 16-4676, 2018 WL 8693814, at *7 (C.D. Cal. August 28, 2018) ("Plaintiff
26   bears the burden to prove patent infringement by a preponderance of the evidence.")
     (citing *Novartis Corp. v. Ben Venue laboratories, Inc.*, 271 F.3d. 1043, 1046–1049
27   (Fed. Cir. 2001)). Thus, the Court must revisit this question in light of the appropriate
     standard and burden that is now applicable.
28

commencement of suit.'" *Parallax Grp. Int'l, LLC v. Incstores.com, LLC*, No. 16-0929, 2017 WL 3017059, at *1 (C.D. Cal. Jan. 25, 2017) (citing *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003)) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n. 5 (1992)) (internal quotations omitted).

"Standing to sue for infringement stems from the Patent Act, which provides: '[a] patentee shall have remedy by civil action for infringement of his patent.'" *Parallax Grp. Int'l, LLC*, WL 3017059, at *1 (quoting 35 U.S.C. § 281). "As defined in § 100(d), 'patentee' includes not only the patentee to whom the patent was issued but also 'the successors in title to the patentee.'" *Id.* (quoting 35 U.S.C. § 100(d)).

"An assignment of patent rights operates to transfer title to the patent, while a license leaves title in the patent owner." *Agarwal v. Buchanan*, No. 17-2182, 2017 WL 5125752, at *2 (C.D. Cal. June 22, 2017) (quoting *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1116 (Fed. Cir. 1996))). "To create an assignment, an instrument in writing must transfer '(1) the entire exclusive patent right, (2) an undivided interest in the patent rights, or (3) the exclusive right within any geographical region of the United States.'" *Id.* (citing *Minco*, 95 F.3d at 1117) (quoting *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). "An agreement that does not transfer one of these three interests is merely a license[,]" and "[a] licensee cannot establish standing unless it holds 'all substantial rights' under the patent." *Id.* (citing *Prima Tek II, LLC v. A-Roo, Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000)). " In summation, an exclusive licensee with all substantial rights has standing to sue in his own name, an exclusive licensee can sue only as a co-plaintiff with the patentee, and a holder of a bare license has no standing to sue for patent infringement whatsoever." *Propat Int'l Corp. v. Rpost, Inc.*, No. 03-1011, 2005 WL 6233792, at *2 (C.D. Cal. Nov. 28, 2005).

Plaintiff can therefore only establish standing to sue for infringement if (a) Plaintiff has established the 2008 Loan Agreements created an assignment of Defendant's initial IP rights or, (b) Defendant provided Plaintiff an exclusive license

(by way of the secured transaction agreement) that sufficiently evidences that the agreements granted substantial rights to the IP in a manner sufficient enough to grant Plaintiff standing to sue for infringement of the IP Rights themselves (rather than suing to collect on the loan default amount or any of the limited rights granted by way of the transaction).  *See* JSF, ¶¶ 10–11.

### B. Did the 2008 Agreement Assign the IP from Defendant to NextPat?

Plaintiff argues that the facts prove Defendants are liable for patent infringement because "[i]t is undisputed that Defendant NextEngine used, offered for sale, and sold the 3D Scanner and associated products utilizing Plaintiff's patents *after* termination of the license and *while* Plaintiff was a patentee."  Plaintiff's Memo, at 3 (emphasis in original).[5]  Defendant counters that NextPat was merely a nominal custodian to the IP that it assigned to Plaintiff—making Plaintiff, at best, a nominal custodian—and that the manner in which Plaintiff received the IP (as collateral) was done in bad faith.  *See* Defendants' Brief, 2–3.  Accordingly, Defendant states, "Plaintiff did not and could not have received substantive rights or interests in the IP and thus has no right or standing to pursue any of its infringement claims against Defendants."  *Id.* at 3.

"To determine whether an agreement constitutes a bare license, an exclusive license or a transfer of all substantial rights, the Court must ascertain the intention of the parties and examine the substance of what was granted by the agreement."  *Propat Int'l Corp.*, 2005 WL 6233792, at *3 (citing *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed.Cir.2001); *Ortho Pharm. Corp. v. Genetics*

---

[5] Plaintiff also argues that Defendant Knighton, as Founder, Chairman, Chief Executive Officer, Director, and largest shareholder of Defendant NextEngine, is the alter ego of Defendant NextEngine and "knowingly aided and abetted" Defendant's continued sale of the Products after receiving notice of the license termination. Plaintiff's Memo, 3–4.  Since this claim, and the other related claims against Knighton, are all based on Plaintiff's Direct infringement theory against Defendant, the Court will reserve any additional analysis towards Knighton until the underlying assignment issues are resolved.

*Institute, Inc.*, 52 F.3d 1026, 1033(1995)).  "The use of the word 'exclusive' is not controlling; rather, the Court must examine the substance of the arrangement." *Id.* (citing *Textile Prod., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998)).  "In analyzing the agreement and intention of the parties it is helpful to look at what rights were retained by the grantor and what rights were transferred to the grantee." *Id.* (citing *Intell. Prop. v. TCI Cablevision*, 248 F.3d 1333, 1342 (Fed. Cir. 2001)).  "The nature and scope of any rights retained by the transferor may be used to determine whether the transferee has received sufficient rights to be deemed the effective patentee." *Agarwal*, 2017 WL 5125751, at *2 (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991)).  "Federal Circuit case law provides a nonexclusive list of rights that should be examined; the most important considerations are the exclusive right to make, use, and sell patented products/services and the right to sue alleged infringers." *Id.* (citing *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 619 (Fed. Cir. 2016)).

 "Under California law, the interpretation of contract language is a question of law." *Great Minds v. Off. Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (internal citation omitted).  "[T]he terms of a contract must be construed in a manner that takes into account the context of the language and is consistent with the contract as a whole." *Id.* (citing Cal. Civ. Code § 1641) (citations omitted).  "The courts' superseding objective when interpreting a contract is to 'give effect to the mutual intention of the parties as it existed at the time of contracting.'" *Int'l Brotherhood. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (quoting Cal. Civ. Code § 1636)).  "[M]ost importantly, [though], '[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Id.* (quoting Cal. Civ. Code § 1641).  "California case law consistently reaffirms the primacy of this principle[.]" *Id.* (citations omitted).

 The Court finds that the 2008 Loan Agreements did not constitute an assignment of the IP Rights and that, when fully viewed in context, the limited rights

that the agreement did grant NextPat—which were arguably too minimal to be categorized as a license either—were not "sufficient rights" to deem Plaintiff "the effective patentee." *See Agarwal*, 2017 WL 5125751, at *2. Here, it is undisputed that NextPat received all of Defendant's IP "rights, title, and interest"—in exchange for an exclusive license "back to such [IP] rights"—in order "to facilitate the [2008 Note] restructuring." *See* JSF, ¶ 14. However, the prior sections of the agreement reveal that the parties agreed Defendant pledged its IP "to Bigfoot *as collateral*" for a series of loans that Bigfoot had made to Defendant using "secured promissory notes and security agreements." *See* JSF, ¶ 10 (emphasis added). In June 2008, the parties then restructured the security loan to require the collateral be assigned and held by third party custodian, NextPat, also "*solely* for that purpose." *See* JSF, ¶¶ 10–12 (emphasis added). When viewing the contract as a whole, and acknowledging the stipulated fact that NextPat became a nominal custodian once Defendant defaulted, the contract supports the inference that NextPat did gain some of Defendant's IP Rights, but that the rights granted were still subject to NextPat's duties as a secured creditor and Defendant's rights in the IP as debtor. In essence, the contract clearly granted a security interest. *See* Cal. Com. Code § 1201(35) (West) ("'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation."). The Court was unable to find any law, nor has either party offered any, to definitively establish that pledging a patent as security for a loan—thereby giving NextPat a security interest in the patent—effectively equates to an assignment of the ownership of the patent itself. While it is clear that NextPat was entitled to the repayment of the money provided to Defendant, and that it held title to the IP in the context of its security interest, Plaintiff has offered entirely no support for the inference that NextPat's security interest equates to full ownership of the patent. Thus, the Court declines to entertain such a strong inference.

In addition to the contract provisions explicitly stating that the IP is being pledged as collateral, there is also plain language that supports a finding that the few

powers NextPat did hold—as the IP custodian—were far smaller in scope than what Plaintiff now alleges before the Court.  Pursuant to the A&L Agreement, as long as no default occurred, NextPat was prohibited from selling the IP rights and needed to defer any solicitation for sale or other encumbrance on the IP.  *See* JSF, 17.  If a default did occur, NextPat could then exercise "certain revocation rights" and take back the exclusive license that it had granted Defendant, but only to the extent that doing so assisted in "facilitat[ing] the Note restructuring."  *See* JSF, ¶¶ 14, 16–18. Under the Mortgaged Shares ("MS") Agreement, NextPat was instructed what options it had, and what specific steps it needed to take in order to utilize those options, in order to satisfy its outstanding interest. These facts further establish that Defendant did not intend to grant NextPat complete ownership of the IP Rights or Properties. The MS agreement states that "[i]f any part of the IP collateral is to be sold by public auction," then Bigfoot must first "notify Defendant . . . and allow Defendant . . . a reasonable opportunity to purchase the IP at a higher bid."  JSF 25(c).  Indeed, it is undisputed that Bigfoot (using NextPat) could exercise one of its numerous rights, and that those included: transferring the Mortgaged shares to Bigfoot, selling or licensing the IP rights, or selling the Mortgaged shares.  JSF, ¶ 22.  Be that as it may, it was also explicitly stated that "for the avoidance of doubt", the proceeds of such a sale "must be applied toward the satisfaction or partial satisfaction of the Note."  JSF, ¶¶ 22–23. Once all obligations are paid, Bigfoot's security interest would then be discharged and extinguished.  JSF, ¶ 24.  Thus, the context of this agreement suggests that, once Defendant fully repaid the loan, any remaining rights to own the IP (or keep Defendant from using the IP) would then extinguish.  Again, Plaintiff has provided no arguments via its briefs , nor any contract excerpts or other evidence, to establish a finding that NextPat received anything more than a security interest from the 2008 Loan Agreements.

Accordingly, Plaintiff has not provided any proof to establish that Defendant provided any substantial rights beyond NextPat's ability to relinquish Defendant's

exclusive license to use the IP (until the loan was repaid) and its ability to sell the IP if Plaintiff desired to satisfy the Note using that method.  Plaintiff has failed to prove, by a preponderance of evidence, that such rights equate to "an exclusive license with all substantial rights" sufficient enough to provide NextPat (and, by extension, Plaintiff) with standing to sue for patent infringement based on the 2008 Loan Agreements. *See Agarwal*, 2017 WL 5125752, at *2.  Plaintiff's contentions have half-heartedly raised the aforementioned patent infringement issues, at best, and have completely neglected to inform the discussion, as required, in order to sustain such a claim.  Thus, Plaintiff's patent claims fail as a matter of law.

### C. **Plaintiff's Remaining Claims**

Whereas the Court has found that the 2008 Loan Agreements did not grant any rights beyond that of a secured creditor, at best, that is dispositive of all of Plaintiffs claims.  Thus, the Court declines to further consider Plaintiff's trademark infringement and unfair competition claims.

## III.   **CONCLUSION**

Plaintiff has failed to establish standing for any of its claims, and consequently the Court finds in favor of Defendants. Plaintiff's request for relief is **DENIED**.

Defendants are ORDERED to file a Proposed Judgment within 5 days of the issuance of this Order, to which Plaintiff shall have 5 days to object.

**IT IS SO ORDERED.**

Dated:  September 3, 2021

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE